[Cite as *In re V.M.*, 2018-Ohio-4974.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| IN RE V.M. | : | Case No. 18CA15 |
|     D.M. | : | |
|     N.M. | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| Adjudicated Dependent Children | : | **Released: 12/04/18** |

APPEARANCES:

James A. Anzelmo, Gahanna, Ohio, for Appellant.

Timothy L. Warren, Athens, Ohio, for Appellee.

McFarland, J.

{¶1} Appellant, the children's maternal grandmother, appeals the trial court's judgment that granted Appellee, Athens County Children Services (ACCS), permanent custody of nine-year-old V.M., seven-year-old D.M., and five-year-old N.M. Appellant raises the following arguments: (1) the trial court plainly erred by allowing the children's guardian *ad litem* to testify; (2) the court incorrectly concluded that it did not need to make another reasonable-efforts finding before granting Appellee permanent custody; and (3) the court's decision is against the manifest weight of the evidence. None of Appellant's arguments have merit. Accordingly, we overrule appellant's three assignments of error and affirm the trial court's judgment.

## I.  FACTS

{¶2}  The three children have lived with Appellant for most of their lives.  Their mother and respective fathers largely abdicated responsibility for the children.  V.M.'s father maintained contact with her, but V.M. never lived with her father.  None of the biological parents are involved in this appeal.

{¶3}  Appellant tried to maintain the children in a safe and stable environment, but Appellant allowed the children's mother and the mother's boyfriend to frequently disrupt the children's lives.  Additionally, Appellant's adult son lived in the home, and he was not a positive presence in the children's lives.  He reportedly was violent with the children and had once attempted suicide.

{¶4}  Appellant developed her own issues and caring for the children became problematic.  In late 2016, Appellant reported to Appellee that "she was at her wit's end and needed respite for the children."  Appellant later overdosed on her blood pressure medication.

{¶5}  Appellee subsequently filed complaints alleging that the children are neglected and dependent children.  The complaint alleged the following:  (1) the children had been living with Appellant; (2) Appellant reported that she is not certain whether she can continue to keep the children

safe, that she does not have electricity, and that she lacks funds to buy food for the children; (3) then eight-year-old V.M. and six-year-old D.M. reportedly had engaged in sexual intercourse; (4) the children have witnessed their mother and the mother's boyfriend, as well as the children's uncle and his girlfriend, engaging in sex; (5) Appellant stated "she is about to have a breakdown with everything going on;" and (6) D.M. indicated that he "has N.M., age 4, and V.M. 'suck on his wiener.' "

{¶6} On February 22, 2017, the court adjudicated the children dependent and dismissed the neglect allegations. Nine months later, Appellee filed motions for permanent custody. Appellee alleged that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent and that placing the children in Appellee's permanent custody is in their best interests.

{¶7} At the permanent custody hearing, Nickie Webb, the children's mental health counselor, testified that she counseled V.M. and D.M. for approximately two and one-half years and that she counseled N.M. for approximately one year. When Ms. Webb first engaged with D.M., he was hyperactive and displayed poor social skills. Ms. Webb explained that D.M. often urinated on the floor or on himself. She indicated that D.M. became more aggressive throughout her counseling and that she learned he had

harmed or killed animals: he used bug spray to kill frogs; chopped up a pet snake with a knife; and picked up a dog at Appellant's house, dropped it, and broke its leg.

{¶8}  Ms. Webb stated that she worked with Appellant to integrate therapy into D.M.'s daily life.  She attempted to teach appellant skills for working with oppositional, defiant, and ADHD-like behaviors.  However, Appellant missed or canceled several appointments, so they "had trouble getting into a pattern."

{¶9}  Ms. Webb explained that in late 2016, when D.M. entered Appellee's temporary custody, "[h]is behaviors settled quite a bit" and she achieved a "baseline" with him.  She stated that she worked to improve D.M.'s social skills, as well as his ability to recognize appropriate boundaries in his interactions with his siblings and others.  Ms. Webb testified that in order to have the greatest opportunity for a successful outcome, D.M. needs a structured environment and continued counseling.

{¶10}  Ms. Webb explained that when she first encountered V.M., V.M. had "a lot of trouble lying," she was behind in school, and she was aggressive with her siblings.  Ms. Webb stated that V.M.'s issues stemmed from her desire for consistency from her biological parents and that V.M. needs consistency and discipline.  Ms. Webb further indicated that V.M. has

expressed a desire to live with Appellant. Ms. Webb noted that because V.M. has lived with Appellant for most of her life, V.M. is bonded with Appellant and would be upset if she did not see Appellant anymore.

{¶11} Ms. Webb testified that she began counseling N.M. around the time that N.M. entered Appellee's temporary custody. She related that N.M. was having tantrums, was hyperactive, and lied. Ms. Webb further noted that N.M. appeared to be developmentally delayed. She explained that V.M.'s speech was difficult to understand. Ms. Webb believes that N.M. needs a high level of supervision and a consistent environment.

{¶12} D.M.'s foster mother testified that D.M. has lived in her home for just over one year. She stated that when D.M. first entered her home, his behavior "was pretty rough." The foster mother explained that D.M. had angry outbursts, hit other children, did not follow directions, and hoarded food. She further related that D.M. did not urinate or defecate in the toilet. Instead, "[h]e was urinating on everything."

{¶13} The foster mother stated that although D.M.'s behaviors have improved, he still needs constant supervision. She believes that the consistent structure and routine her home provides has benefitted D.M.

{¶14} V.M. and N.M.'s foster mother testified that the girls have lived with her since they entered Appellee's temporary custody. She stated

that when N.M. entered her home, N.M. "was mostly nonverbal" and explained that N.M. "either barked or she made monkey noises, or other animal sounds" to communicate. The foster mother found N.M. to have "very limited" vocabulary for a four-year-old. Additionally, N.M. did not readily comprehend the words spoken to her. The foster mother testified that although N.M.'s speech has improved since entering her home, N.M. requires constant supervision.

{¶15} The foster mother testified that when V.M. entered the home, V.M. "literally [threw] 12 hour temper tantrums." V.M. would "scream, kick things, holler, * * * slam doors, [and] jump on her bed." The foster mother stated that V.M. now experiences "2 to 4" hour tantrums, and only when she is unable to attend a visit with Appellant.

{¶16} The foster mother explained that although N.M. and V.M. struggle to get along, V.M. would not mind living in Appellant's home with N.M. The foster mother further related that V.M. does not want to live with D.M.

{¶17} Appellant testified that before Appellee removed the children from her home, she had served as their legal custodian. Appellant explained that V.M. lived with her throughout most of her life, that D.M. lived with her since he was approximately three years of age, and that N.M. lived with her

since she was about one year old.  Appellant stated that she took custody of the children because the children's mother "was going down the road of drugs" and "did not properly supervise the children."

{¶18}  Appellant related that she allowed the children's mother to stay at Appellant's home when needed.  She also indicated that the mother and the mother's boyfriend have been involved in some domestic violence incidents in the home when the children when present.

{¶19}  Appellant stated that the past summer, the children's mother "went with the carnival."  When the children's mother returned from the carnival, Appellant told the mother that she could not live at her home. Appellant indicated that since time, the mother has been living with her boyfriend's parents.

{¶20}  Appellant testified that she recently divorced from her husband and moved out of the residence where she and the children had lived. Appellant stated that the former residence needed a lot of repairs and was not suitable for the children.  Appellant explained that she recently obtained a two-bedroom apartment that would be sufficient to house the two girls but not D.M.

{¶21}  Appellant reported that she has been diagnosed with bipolar disorder, anxiety, and depression and that sees a counselor once per week.

Appellant admitted that when the children were in her care, she did not prioritize their needs and described her care of the children as "pretty shitty." She believes that if the court returns the children to her custody, she will do better: "I've woken up and I noticed that I have to change in order to give them a better life."

{¶22} ACCS Caseworker Tara Carsey testified that she has worked with the family since late 2016 and that the children have remained in Appellee's temporary custody since that time. Ms. Carsey explained that when Appellee removed the children from the home, they had been in Appellant's legal custody. Ms. Carsey stated that Appellee's concerns included a lack of supervision and stability, as well as Appellant's mental health.

{¶23} Ms. Carsey averred that she worked with Appellant to improve her supervision of the children and that she encouraged Appellant to provide the children with more consistency in their lives. She explained that when the children lived with Appellant, Appellant had permitted the children's mother and her boyfriend in and out of the home, which created instability for the children. Ms. Carsey additionally related that Appellee had concerns about Appellant's adult son who lived in the home. Ms. Carsey indicated

that the son allegedly had some mental health issues and had attempted suicide.

{¶24} Ms. Carsey testified that when the children were in the agency's temporary custody, Appellant attended most of her visits with the children. Ms. Carsey stated that they attempted off-site visitations but later returned them to on-site visits due to Appellant's inability to properly supervise the children. She indicated that during the off-site visits, the children "just seemed kind of wild and [Appellant] didn't have the ability to rein them back in." Rather, "[i]t was more like trying to herd cats."

{¶25} Ms. Carsey explained that the children "have a lot of behaviors" and "issues of their own" that Appellant could not always control. She also related that the children had not been receiving "the proper and necessary treatment that they needed when they were in [Appellant's] care."

{¶26} Ms. Carsey does not believe that Appellant can safely maintain and supervise all of the children in the home. She does not believe Appellant "is able to provide enough of a structured environment to maintain their issues and behaviors." Ms. Carsey recognized that Appellant claimed that Appellant's mother could help with the children, but Ms. Carsey does not "know how much [appellant's] mom is able to help."

{¶27} Ms. Carsey further explained that Appellant has mental health issues that she must continue to address. Additionally, Appellant does not "have a lot of supports" and does not have transportation. Ms. Carsey noted that Appellant recently obtained her own apartment, but she believes that Appellant's inability to control the children during the short-term off-site visitations documented that Appellant could not provide the children with the high level of supervision that they need.

{¶28} The children's guardian *ad litem* testified and explained that her "opinion has sort of evolved since [she] wrote [her] report." She explained:

> Things have changed. [Appellant] has gotten housing just very recently. These are very high needs children. They need a lot of discipline. They need structure in their lives and I believe that there might be a possibility that [appellant] could maybe have one, have [V.M.] because [V.M.] is older and takes care of herself, but I believe that [D.M.] and [N.M.] are * * * such high needs and it would be very difficult for her to have all three. So, I believe it would be definitely in the best interests of [N.M.] and [D.M.] to be placed [in Appellee's permanent custody]."

{¶29} The guardian *ad litem* stated that when she prepared her written report, Appellant had been living at the former residence, "which was not appropriate for children at all." The guardian *ad litem* explained that since she prepared her written report, Appellant had obtained an apartment. The guardian *ad litem* related that she had not had a chance to

visit the residence, so she is "just leaving a possibility open" that V.M. could be placed with Appellant. She further indicated, however, that the children need "a resolution as soon as possible."

{¶30} The guardian *ad litem* explained that all three children "love [Appellant] very much and she loves them." The guardian *ad litem* related that the evening before the hearing, the guardian *ad litem* asked the children if they wanted her to convey any words to the judge. D.M. "popped up and he said, * * * 'I want to go back with Mimi.' " V.M. stated, " 'I want that too.' " N.M. stated, " 'me too.' " The guardian noted that although the children want to return to Appellant, she believes that it is in the children's best interests to have "more structure than what [Appellant] can provide." She believes V.M. "might be able to survive" in Appellant's care, but "[n]ot necessarily thrive." However, the guardian ultimately concluded that placing her in Appellee's permanent custody is in her best interests.

{¶31} On May 1, 2018, the trial court granted Appellee permanent custody of the children. The court found that the children could not be placed with any of the biological parents or with Appellant. The court noted that the mother ran off and joined the carnival, D.M.'s and N.M.'s fathers have abandoned them, and V.M.'s father moved to Georgia as V.M. was being placed in Appellee's temporary custody. Moreover, V.M.'s father

tested positive for cocaine the last time he visited Ohio, and his contact with "V.M. has been minimal, sporadic, and hurtful."

**{¶32}** The court noted that Appellant "tried to apply herself to the case plan, and tried to demonstrate that she could somehow assemble all the parts necessary to even attempt trial visits." However, the court concluded that Appellant nonetheless "failed." The court found that Appellant's "life is a fragile one, and has required multiple, substantial supports from various social service agencies."

**{¶33}** The court also determined that the children have special needs. The court noted that when N.M. entered foster care at four years of age, "she was essentially nonverbal" and communicated through "grunting and animal noises." D.M.'s counselor stated that he "should never be left alone with children or animals." V.M. "engages in elaborate lies, steals, and is physically aggressive with the younger siblings." The court did not believe Appellant possesses the capacity to provide for the children's special needs.

**{¶34}** The court found that the chaos the children have experienced throughout their lives will cause "each [to] face significant challenges adapting to reasonable expectations of behaviors in all aspects of their lives." The court determined that the children "each have special needs that

can only be successfully addressed if they have a structured consistent home life as the foundation for their growth."

{¶35} Therefore, the court found that the children could not be placed with any of the parents or with Appellant within a reasonable time or should not be placed with the parents or Appellant.

{¶36} The court additionally found that placing the children in Appellee's permanent custody was in their best interests. The court considered the children's interactions and interrelationships and explained as follows:

> V.M. (now nine years old), and N.M. (now 5), are sisters and share the same foster family since removal. D.M. is a seven year old boy who has been with a different foster family since removal (at the same time as his sisters). Only V.M. has any sense of relationship with [her] father. Others' interactions with the children throughout the fifteen months of this case have been sporadic and disruptive. Maternal grandmother has probably been as constant as she is capable of, given her own life issues, and at least deserves credit for wanting things to be better for these children. She and the children enjoy their visits, and the Court's decision to terminate parental rights will certainly mean additional trauma and distress to these four.
> V.M. and N.M. are bonded, or at least bonding, and learning child-appropriate relationships in a family setting. D.M. is able to visit with his sisters without significant incidents, but the prospects of unifying the children for adoption are not only doubtful, but perhaps ill advised. Neither foster family has expressed interest in adoption.

{¶37} The court next examined the children's wishes:

> Only V.M. has enough maturity to have her expressed desires considered herein. She has said she wants to return to maternal grandmother, but she has also stated she'd like to live with the man

who used to be married to maternal grandmother. D.M. and N.M. are more likely to chime in with a 'me too' comment when the subject is brought up. Given the complexities of the children's identified personal issues, and their inability to comprehend the significance of the decisions and events that bring us to this point, their expressed wishes carry little weight in this case.

{¶38} The court additionally reviewed the children's custodial history. The court noted that V.M. has lived with Appellant since shortly after V.M.'s birth and that the other two children lived with Appellant since shortly after N.M.'s birth. The children's mother and the mother's "various boyfriends moved in and out of [Appellant]'s home throughout [the children's] lives, all with [Appellant]'s consent, or at least lack of protest." The court noted that although the children technically have not been in Appellee's temporary custody for twelve or more months of a consecutive twenty-two month period, the children were removed in December 2016 and have remained in the same foster homes throughout the case.

{¶39} The court next evaluated the children's need for a legally secure permanent placement. The court found: "The children need and deserve legally secure placements, and ideally adoptions which can only be achieved with a grant of permanent custody to ACCS."

{¶40} The court additionally determined that R.C. 2151.414(E)(10) applies—the mother and D.M.'s and N.M.'s fathers abandoned the children.

**{¶41}** The court further found that Appellee "already established that reasonable efforts at reunification have been made prior to the hearing on the instant motion for permanent custody" and that the court need not make another reasonable efforts finding.

**{¶42}** The court thus placed the children in Appellee's permanent custody.

## II. ASSIGNMENT OF ERROR

**{¶43}** Appellant timely appealed and raises three assignments of error:

First Assignment of Error:

"The trial court plainly erred by admitting the testimony of the guardian *ad litem*."

Second Assignment of Error:

"The trial court erred by concluding that it was not required to determine whether children services satisfied a duty to take reasonable efforts to reunify V.M., D.M., and N.M. with their family.

Third Assignment of Error:

"Children services failed to establish, by clear and convincing evidence, that it should be given permanent custody of V.M., D.M., and N.M."

## III. LEGAL ANALYSIS

### A.

## Guardian *Ad Litem*'s Testimony

{¶44}  In her first assignment of error, Appellant contends that the trial court plainly erred by admitting the guardian *ad litem*'s testimony regarding the children's best interests when the guardian *ad litem* had not viewed Appellant's current living environment.

{¶44}  As Appellant notes, she did not object to the guardian *ad litem*'s testimony during the permanent custody hearing and therefore forfeited all but plain error on appeal. *E.g., State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15; *State v. Clinkscale,* 122 Ohio St.3d 351, 2009–Ohio–2746, 911 N.E.2d 862, ¶ 31; *Stores Realty Co. v. City of Cleveland, Bd. of Bldg. Standards and Bldg. Appeals,* 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975) ("Ordinarily, errors which arise during the course of a trial, which are not brought to the attention of the court by objection or otherwise, are waived and may not be raised upon appeal."). To find plain error, (1) there must be an error (*i.e.,* a deviation from a legal rule), (2) the error must be obvious, and (3) the error must have affected the outcome of the trial. *E.g., State v. Payne,* 114 Ohio St.3d 502, 2007–Ohio–4642, 873 N.E.2d 306, ¶ 16.  Furthermore, "[i]n appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no

objection was made at the trial court, seriously affects the basic fairness,

integrity, or public reputation of the judicial process, thereby challenging the

legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson,*

79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus.  Moreover, plain error

does not exist unless the court's obvious deviation from a legal rule affected

the outcome of the proceeding. *E.g., State v. Barnes,* 94 Ohio St.3d 21, 27,

759 N.E.2d 1240 (2002).

{¶45}  In the case at bar, as we explain below, we do not believe that

the trial court plainly erred by admitting the guardian *ad litem*'s testimony.

{¶46}  A guardian *ad litem*'s function in a juvenile proceeding is "to

provide the court with relevant information and an informed

recommendation regarding the child's best interest." Sup.R. 48(D); *accord*

*In re C.B.,* 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 14.

"[T]he guardian's role is to 'perform whatever functions are necessary to

protect the best interest of the child, including, but not limited to * * *

monitoring the services provided the child by the public children services

agency * * * [and filing] any motions and other court papers that are in the

best interest of the child.' " *C.B* at ¶ 14, quoting R.C. 2151.281(I).  A

guardian *ad litem's* general duties include investigating the background of

the parents and delivering a report and recommendation to the court

regarding the child's best interests. *In re C.D.M.,* 4th Dist. Hocking No. 13CA1, 2013-Ohio-3792, 2013 WL 4734804, ¶ 25.

**{¶47}** In the case at bar, Appellant asserts that the guardian *ad litem* based her recommendation on outdated information regarding Appellant's living situation and, thus, that the guardian *ad litem* did not base her recommendation on relevant information. We do not believe that the trial court made an obvious error by admitting the guardian *ad litem*'s testimony. The guardian ad litem fully explained the basis of her recommendation and noted that Appellant recently obtained a new residence. The guardian thus cautioned that her recommendation did not take into account Appellant's newly-obtained residence. Additionally, Appellant's counsel cross-examined the guardian *ad litem* and made the court well-aware that the guardian *ad litem* had not yet visited Appellant's new residence. Therefore, we believe that the guardian *ad litem*'s understandable failure to visit Appellant's recently-acquired residence was a question of weight, and not a question of admissibility. *See In re T.C.*, 6th Dist. Lucas No. L-15-1106, 2015-Ohio-3665, 2015 WL 5306552, ¶ 23 (observing that trial court entitled to weigh guardian *ad litem*'s testimony); *Hunter–June v. Pitts,* 12th Dist. Butler No. CA2013-09-179, 2014-Ohio-2473, 2014 WL 2568602, ¶ 21 ("The trial court heard the context and the explanations of the guardian *ad*

*litem* with regard to her investigation and in support of her recommendations, which were outlined in a 11–page report. * * * [T]he guardian *ad litem* was questioned by both parents' counsel. The magistrate was entitled to believe or disbelieve her testimony and to consider it in light of all of the other testimony presented at the hearing."); *In re M.Z.,* 9th Dist. Lorain No. 11CA010104, 2012-Ohio-3194, 2012 WL 2874375, ¶ 35 (stating that trial court permitted to "believe or disbelieve the guardian's testimony and to consider it in the context of all the evidence before the court").

{¶48} Moreover, we observe that the guardian *ad litem* did not base her recommendation solely upon whether Appellant could provide the children with a physically appropriate home. Instead, the guardian *ad litem* indicated that even if Appellant lived in a physically appropriate home, the children need more than a structurally sound residence. The guardian *ad litem* stated that the children—especially D.M. and N.M.—need consistency, structure, and discipline and that she does not believe Appellant possesses the capability to fulfill these needs. Thus, although the guardian *ad litem* left open a possibility that Appellant's physical environment may be adequate for V.M., the guardian *ad litem* clarified that she does not believe Appellant can provide the structure and discipline the children need.

{¶49} Appellant nevertheless asserts that one of our earlier decisions shows that the trial court should not have admitted the guardian *ad litem*'s testimony. *In re S.C.*, 189 Ohio App.3d 308, 2010–Ohio–3394, 938 N.E.2d 390 (4th Dist.). We find *S.C.* readily distinguishable. In *S.C.*, the evidence indicated that the trial court partially relied upon a two-year-old psychological evaluation. *Id.* at ¶ 30. Here, by contrast, the guardian *ad litem* did not base her report upon two-year-old information regarding Appellant's living situation. Instead, the guardian *ad litem* based her report upon Appellant's living situation as of the date the guardian prepared her report. Appellant's living situation did not change until one week before the date of the guardian *ad litem*'s testimony. Moreover, the guardian *ad litem* clarified that her recommendation did not account for Appellant's changed living situation. Again, we believe that the trial court was entitled to weigh the guardian *ad litem*'s testimony in light of Appellant's changed living situation. We do not believe that the guardian *ad litem*'s understandable failure to investigate Appellant's recently-changed living situation rendered her recommendation obviously irrelevant. Therefore, we do not believe that the trial court plainly erred by admitting her testimony.

{¶50} Accordingly, based upon the foregoing reasons, we overrule Appellant's first assignment of error.

## B.

## Reasonable Efforts

{¶51} In her second assignment of error, Appellant argues that the trial court erred by determining that it did not need to find that Appellee used reasonable efforts to reunify the children with appellant. Appellant recognizes that the court found that Appellee previously satisfied its duty to use reasonable efforts, but Appellee disagrees with the trial court that it did not need to make any further reasonable-efforts determination before granting Appellee permanent custody.

{¶52} R.C. 2151.419(A)(1) requires a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children * * *." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 41; *accord In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, 2016 WL 915012, ¶ 72. Thus, " '[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to

R.C. 2151.413, or to hearings held on such motions pursuant to R.C.

2151.414.' " *C.F.* at ¶ 41, quoting *In re A.C.*, 12th Dist. Clermont No.

CA2004-05-041, 2004-Ohio-5531, 2004 WL 2340127, ¶ 30.  Nonetheless,

"[t]his does not mean that the agency is relieved of the duty to make

reasonable efforts" before seeking permanent custody. *Id.* at ¶ 42.  Instead,

at prior "stages of the child-custody proceeding, the agency may be required

under other statutes to prove that it has made reasonable efforts toward

family reunification." *Id.*  Additionally, "[if] the agency has not established

that reasonable efforts have been made prior to the hearing on a motion for

permanent custody, then it must demonstrate such efforts at that time." *Id.* at

¶ 43.

{¶53}  We discussed the meaning of "reasonable efforts" in *C.B.C.*,

*supra*, at ¶ 76, as follows:

> In general, "reasonable efforts" mean " '[t]he state's efforts to
> resolve the threat to the child before removing the child or to permit
> the child to return home after the threat is removed.' " *C.F.* at ¶ 28,
> quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying
> the State's Burden Under Federal Child Protection Legislation,* 12
> B.U.Pub.Int.L.J. 259, 260 (2003).  " 'Reasonable efforts means that a
> children's services agency must act diligently and provide services
> appropriate to the family's need to prevent the child's removal or as a
> predicate to reunification.' " *In re H.M.K.,* 3rd Dist. Wyandot Nos.
> 16–12–15 and 16-12-16, 2013-Ohio-4317 [2013 WL 5447791], ¶ 95,
> quoting *In re D.A.,* 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104
> [2012 WL 929609], ¶ 30.  In other words, the agency must use
> reasonable efforts to help remove the obstacles preventing family
> reunification. Bean, *Reasonable Efforts: What State Courts Think,* 36

U. Tol. L.Rev. 321, 366 (2005), quoting *In re Child of E.V.,* 634 N.W.2d 443, 447 (Minn.Ct.App.2001), and *In re K.L.P.,* No. C1–99–1235, 2000 WL 343203, at *5 (Minn.Ct.App. Apr. 4, 2000) (explaining that the agency must address what is "necessary to correct the conditions that led to the out-of-home placement" and must "provide those services that would assist in alleviating the conditions leading to the determination of dependency").   However, " '[r]easonable efforts' does not mean all available efforts.  Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re Lewis,* 4th Dist. Athens No. 03CA12, 2003-Ohio-5262 [2003 WL 22267129], ¶ 16.  Furthermore, the meaning of "reasonable efforts" "will obviously vary with the circumstances of each individual case." *Suter v. Artist M.,* 503 U.S. 347, 360, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992).   Additionally, "[i]n determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

**{¶54}** We initially observe that Appellant never argued during the trial court proceedings that Appellee failed to use reasonable efforts to reunite the children with her.  Thus, absent plain error, Appellant has forfeited the argument for purposes of appeal. *In re S.C.,* 189 Ohio App.3d 308, 2010–Ohio–3394, 938 N.E.2d 390 (4th Dist.) ¶¶ 40–41; *In re T.S.,* 8th Dist. No. 92816, 2009–Ohio–5496, ¶ 17; *In re Slider,* 160 Ohio App.3d 159, 2005–Ohio–1457, 826 N.E.2d 356, ¶ 11 (4th Dist); *accord In re J.W.*, 9th Dist. Summit No. 28966, 2018-Ohio-3897, 2018 WL 4656088, ¶ 7.

**{¶55}** The trial court did not plainly err by failing to enter another reasonable-efforts determination before ruling upon Appellee's permanent custody motion.  Appellee filed its permanent custody motion under R.C.

2151.413. Furthermore, throughout the proceedings below, the trial court made several findings that Appellee used reasonable efforts to prevent the children's continued removal from the home. Thus, R.C. 2151.419(A)(1) did not require the trial court to make an additional reasonable-efforts finding when it issued its permanent custody decision. *See In re N.A.P.*, 4th Dist. Washington No. 12CA30, 2013-Ohio-689, 2013 WL 772815, ¶ 44. Moreover, Appellant has not cited any authority for her proposition that a trial court must make another reasonable-efforts determination if a child's caregiver makes improvements during the course of the permanent custody hearing. We therefore summarily reject this proposition.

{¶56} Accordingly, based upon the foregoing reasons, we overrule Appellant's second assignment of error.

C.

Permanent Custody Decision

{¶57} In her third assignment of error, Appellant essentially asserts that the trial court's decision to award Appellee permanent custody of the children is against the manifest weight of the evidence. She alleges that the record does not contain clear and convincing evidence to support the court's judgment.

1. Standard of Review

{¶58} Generally, a reviewing court will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *E.g., In re B.E.*, 4th Dist. Highland No. 13CA26, 2014–Ohio–3178, ¶ 27; *In re R.S.,* 4th Dist. Highland No. 13CA22, 2013–Ohio–5569, ¶ 29.

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).

{¶59} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' " *Eastley* at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485

N.E.2d 717 (1st Dist.1983); *accord In re Pittman,* 9th Dist. Summit No.

20894, 2002–Ohio–2208, ¶¶ 23–24.

{¶60} The question that we must resolve when reviewing a

permanent custody decision under the manifest weight of the evidence

standard is "whether the juvenile court's findings * * * were supported by

clear and convincing evidence." *In re K.H.,* 119 Ohio St.3d 538, 2008–

Ohio–4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing evidence" is:

> the measure or degree of proof that will produce in the mind of the
> trier of fact a firm belief or conviction as to the allegations sought to
> be established. It is intermediate, being more than a mere
> preponderance, but not to the extent of such certainty as required
> beyond a reasonable doubt as in criminal cases. It does not mean clear
> and unequivocal. *In re Estate of Haynes,* 25 Ohio St.3d 101, 103–04,
> 495 N.E.2d 23 (1986).

In determining whether a trial court based its decision upon clear and

convincing evidence, "a reviewing court will examine the record to

determine whether the trier of facts had sufficient evidence before it to

satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74,

564 N.E.2d 54 (1990); *accord In re Holcomb,* 18 Ohio St.3d 361, 368, 481

N.E.2d 613 (1985), citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d

118 (1954) ("Once the clear and convincing standard has been met to the

satisfaction of the [trial] court, the reviewing court must examine the record

and determine if the trier of fact had sufficient evidence before it to satisfy

this burden of proof."); *In re Adoption of Lay,* 25 Ohio St.3d 41, 42–43, 495

N.E.2d 9 (1986). *Cf. In re Adoption of Masa,* 23 Ohio St.3d 163, 165, 492

N.E.2d 140 (1986) (stating that whether a fact has been "proven by clear and

convincing evidence in a particular case is a determination for the [trial]

court and will not be disturbed on appeal unless such determination is

against the manifest weight of the evidence"). Thus, if the children services

agency presented competent and credible evidence upon which the trier of

fact reasonably could have formed a firm belief that permanent custody is

warranted, then the court's decision is not against the manifest weight of the

evidence. *In re R.M.,* 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013–

Ohio–3588, ¶ 62; *In re R.L.,* 2nd Dist. Greene Nos. 2012CA32 and

2012CA33, 2012–Ohio–6049, ¶ 17, quoting *In re A.U.,* 2nd Dist.

Montgomery No. 22287, 2008–Ohio–187, ¶ 9 ("A reviewing court will not

overturn a court's grant of permanent custody to the state as being contrary

to the manifest weight of the evidence 'if the record contains competent,

credible evidence by which the court could have formed a firm belief or

conviction that the essential statutory elements * * * have been

established.' "). Once the reviewing court finishes its examination, the court

may reverse the judgment only if it appears that the fact-finder, when

resolving the conflicts in evidence, " 'clearly lost its way and created such a

manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.*, quoting *Martin*, 20 Ohio App.3d at 175; *accord State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶61}  Furthermore, when reviewing evidence under the manifest weight of the evidence standard, an appellate court generally must defer to the fact-finder's credibility determinations. *Eastley* at ¶ 21.  As the *Eastley* court explained:

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts. * * *
> If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."*Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶62}  Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well."

*Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997);

*accord In re Christian,* 4th Dist. Athens No. 04CA10, 2004–Ohio–3146, ¶ 7.

As the Supreme Court of Ohio long-ago explained:

> In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by printed record. *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).

**{¶63}** Furthermore, unlike an ordinary civil proceeding in which a

judge has little to no contact with the parties before a trial, in a permanent

custody case a trial court judge may have significant contact with the parties

before a permanent custody motion is even filed. In such a situation, it is not

unreasonable to presume that the trial court judge had far more opportunities

to evaluate the credibility, demeanor, attitude, etc., of the parties than this

court ever could from a mere reading of the permanent custody hearing

transcript.

## 2. Permanent Custody Principles

**{¶64}** A parent has a "fundamental liberty interest" in the care,

custody, and management of his or her child and an "essential" and "basic

civil right" to raise his or her children. *Santosky v. Kramer,* 455 U.S. 745,

753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Murray,* 52 Ohio St.3d

155, 157, 556 N.E.2d 1169 (1990); *accord In re D.A.,* 113 Ohio St.3d 88,

2007–Ohio–1105, 862 N.E.2d 829, ¶¶ 8–9.  A parent's rights, however, are not absolute. *D.A.* at ¶ 11.  Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham,* 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.,* 300 So.2d 54, 58 (Fla.App.1974).  Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

### 3.  Permanent Custody Framework

{¶65}  A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody.  In this case, Appellee sought permanent custody of the child by filing a motion under R.C. 2151.413.  When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies. R.C. 2151.414(A).

{¶66}  R.C. 2151.414(A)(1) requires the court to hold a hearing.  The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. *Id.* Additionally, when considering whether to grant a children services agency

permanent custody, a trial court should consider the underlying purposes of

R.C. Chapter 2151: "to care for and protect children, 'whenever possible, in

a family environment, separating the child from the child's parents only

when necessary for the child's welfare or in the interests of public safety.' "

*In re C.F.*, 113 Ohio St.3d 73, 2007–Ohio–1104, 862 N.E.2d 816, ¶ 29,

quoting R.C. 2151.01(A).

{¶67}  R.C. 2151.414(B)(1) permits a trial court to grant permanent

custody of a child to a children services agency if the court determines, by

clear and convincing evidence, that the child's best interest would be served

by the award of permanent custody and that one of the following conditions

applies:

> (a) The child is not abandoned or orphaned or has not been in
> the temporary custody of one or more public children services
> agencies or private child placing agencies for twelve or more months
> of a consecutive twenty-two month period ending on or after March
> 18, 1999, and the child cannot be placed with either of the child's
> parents within a reasonable time or should not be placed with the
> child's parents.
> (b) The child is abandoned.
> (c) The child is orphaned, and there are no relatives of the child
> who are able to take permanent custody.
> (d) The child has been in the temporary custody of one or more
> public children services agencies or private child placing agencies for
> twelve or more months of a consecutive twenty-two month period
> ending on or after March 18, 1999.
> (e) The child or another child in the custody of the parent or
> parents from whose custody the child has been removed has been
> adjudicated an abused, neglected, or dependent child on three separate
> occasions by any court in this state or another state.

Thus, before a trial court may award a children services agency permanent custody, it must find (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies, and (2) that awarding the children services agency permanent custody would further the child's best interest.

{¶68} In the case at bar, Appellant does not clarify whether she challenges the trial court's finding that one of the circumstances specified in R.C. 2151.414(B)(1) applies, its best-interest finding, or both. However, she appears to limit her challenge to the trial court's best-interest determination. We limit our review accordingly.

### a. Best Interest Factors

{¶69} In the case at bar, Appellant argues that the best-interest factors favor preserving the family unit. Appellant asserts that the evidence plainly shows that she shares "a significant bond with her grandchildren" and that granting Appellee permanent custody of the children would create "trauma and distress." Appellant additionally claims that the trial court did not adequately consider that Appellant's mother would help her care for the children or that Appellant recently acquired a physically appropriate home for the children.

{¶70} R.C. 2151.414(D) requires a trial court to consider specific factors to determine whether a child's best interest will be served by

granting a children services agency permanent custody.  The factors include:

(1) the child's interaction and interrelationship with the child's parents,

siblings, relatives, foster parents and out-of-home providers, and any other

person who may significantly affect the child; (2) the child's wishes, as

expressed directly by the child or through the child's guardian *ad litem*, with

due regard for the child's maturity; (3) the child's custodial history; (4) the

child's need for a legally secure permanent placement and whether that type

of placement can be achieved without a grant of permanent custody to the

agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11)

apply.[1]

---

[1] R.C. 2151.414(E)(7) to (11) state:

> (7) The parent has been convicted of or pleaded guilty to [certain criminal offenses].
> * * * *
> (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
> (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
> (10) The parent has abandoned the child.
> (11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶71} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *C.F.* at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006–Ohio–5513, 857 N.E.2d 532, ¶ 56; *accord In re C.G.*, 9th Dist. Summit Nos. 24097 and 24099, 2008–Ohio–3773, ¶ 28; *In re N.W.*, 10th Dist. Franklin Nos. 07AP–590 and 07AP–591, 2008–Ohio–297, 2008 WL 224356, ¶ 19. However, none of the best interest factors requires a court to give it "greater weight or heightened significance." *C.F.* at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *Id.* at ¶ 63-64 (noting that court evaluates totality of the circumstances when considering child's best interest in permanent custody proceeding); *e.g., In re A.M.*, 4th Dist. Athens No. 17CA43, 2018-Ohio-2072, 2018 WL 2436454, ¶ 55, citing *In re K.M.S.*, 3rd Dist. Marion Nos. 9–15–37, 9–15–38, and 9–15–39, 2017–Ohio–142, 2017 WL 168864, ¶ 24, and *In re A.C.,* 9th Dist. Summit No. 27328, 2014–Ohio–4918, ¶ 46. In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016–Ohio–916,

2016 WL 915012, ¶ 66, citing *In re Adoption of Ridenour,* 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

### i. Children's Interactions and Interrelationships

{¶72} The children and Appellant share a strong bond and their love is evident. The children looked forward to visiting Appellant. Unfortunately, Appellant admittedly did not prioritize their needs when they were in her care. Appellant conceded that her care of the children was "pretty shitty." Indeed, the children's behavioral and emotional states document that they did not receive adequate care when in Appellant's custody. N.M., at four years of age, was nonverbal when she entered Appellee's temporary custody, uttering only animal noises and grunts. D.M. and V.M. reportedly engaged in sexual behaviors with each other. V.M. told elaborate tales and acted aggressively. D.M. hurt or killed animals and had anger issues. Thus, while on the surface the familial bonds appear strong, Appellant's interaction and interrelationship with the children has not resulted in a positive outcome for the children. *See In re J.F.*, 8th Dist. No. 105504, 2018-Ohio-96, 102 N.E.3d 1264, 2018 WL 386668, ¶ 65 (stating that "existence of a positive relationship," by itself, not determinative of child's best interest); *In re J.B.,* 8th Dist. Cuyahoga Nos. 98518 and 98519, 2013–Ohio–1703, 2013 WL 1799849, ¶ 111 (noting that although "[f]amily

unity and blood relationship" may be "vital factors" to consider when determining child's best interest, neither is controlling); *accord In re S.S.-1*, 4th Dist. Athens No. 17CA44, 2018-Ohio-1349, 2018 WL 1720650, ¶ 76.

{¶73}  Additionally, Appellee expressed concern that Appellant was unable to adequately supervise the children.  The caseworker testified that Appellee attempted off-site visits but terminated them due to Appellant's lack of control over the children.

{¶74}  The children do not have a positive relationship with their mother.  V.M. initially had a relationship with her father, but the trial court found that the relationship turned hurtful to V.M.  Neither D.M. nor N.M. has a relationship with a biological father.

{¶75}  The three children do not have overly positive interactions and interrelationships with each other.  V.M. and N.M. "struggle" to get along. D.M. and V.M. engaged in sexual conduct—conduct that is wholly inappropriate in a sibling relationship.  V.M. has stated that she does not want to live in the same household as D.M.

{¶76}  All of the children have shown at least mild improvement in their behaviors while in their foster homes.  While none of the foster families intend to adopt the children, the foster families try to provide the children with structure and discipline.

{¶77} In sum, although the children and Appellant share a strong familial bond, the children have not achieved favorable outcomes while in Appellant's care.

### ii. Children's Wishes

{¶78} All three children wish to be returned to Appellant. However, the guardian *ad litem* testified that placing the children in Appellee's custody is in their best interest. *In re S.M.*, 4th Dist. Highland No. 14CA4, 2014–Ohio–2961, ¶ 32 (noting that R.C. 2151.414 permits court to consider child's wishes as child directly expresses or through the guardian *ad litem*).

### c. Custodial History

{¶79} V.M. lived with Appellant until late 2016, when Appellee obtained temporary custody. D.M. and N.M. lived with Appellant for approximately three years before Appellee obtained temporary custody. Before then, they lived with their mother. Since their removal, the children have remained in the same foster homes.

{¶80} When Appellee filed its permanent custody motion, the children had not yet been in Appellee's temporary custody for more than twelve months.

iv. Legally Secure Permanent Placement

{¶81} "Although the Ohio Revised Code does not define the term 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016–Ohio–793, ¶ 56, citing *In re Dyal,* 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.,* 10th Dist. Franklin Nos. 15AP–64 and 15AP–66, 2015–Ohio–4682, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.,* 11th Dist. Lake No. 2012–L–126, 2013–Ohio–1293, ¶ 95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); *In re J.W.,* 171 Ohio App.3d 248, 2007–Ohio–2007, 870 N.E.2d 245, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"); Black's Law Dictionary 1354 (6th Ed.1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure

safety"); *Id.* at 1139 (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.* at ¶ 56.

{¶82} We also observe that a trial court that is evaluating a child's need for a legally secure permanent placement and whether the child can achieve that type of placement need not determine that terminating parental rights is "not only a necessary option, but also the only option." *Schaefer*, *supra*, at ¶ 64. Rather, once the court finds the existence of any one of the R.C. 2151.414(B)(1)(a)-(e) factors, R.C. 2151.414(D)(1) requires the court to weigh "all the relevant factors * * * to find the best option for the child." *Id.* "The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* Instead, a child's best interest is served by placing the child in a

permanent situation that fosters growth, stability, and security. *In re*

*Adoption of Ridenour,* 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

{¶83} Additionally, courts are not required to favor relative

placement if, after considering all the factors, it is in the child's best interest

for the agency to be granted permanent custody. *Schaefer* at ¶ 64; *accord In*

*re T.G.,* 4th Dist. Athens No. 15CA24, 2015–Ohio–5330, ¶ 24; *In re V.C.,*

8th Dist. Cuyahoga No. 102903, 2015–Ohio–4991, ¶ 61 (stating that

relative's positive relationship with child and willingness to provide an

appropriate home did not trump child's best interest). We again observe that

"[i]f permanent custody is in the child's best interest, legal custody or

placement with [a parent or other relative] necessarily is not." *K.M.* at ¶ 9.

Moreover, "relatives seeking custody of a child are not afforded the same

presumptive rights that a natural parent receives." *In re M.H.*, 5th Dist.

Muskingum No. CT2015–0061, 2016–Ohio–1509, 2016 WL 1426473, ¶ 25.

{¶84} In the case at bar, the evidence shows that the children need a

legally secure permanent placement and that they cannot achieve this type of

placement without granting Appellee permanent custody. None of the

parents have a legally secure permanent placement for the children.

{¶85} Furthermore, Appellant does not have a legally secure

permanent placement for the children. Appellant agrees that her current

residence cannot physically house all three children. Moreover, Appellant did not illustrate that she will prioritize the children's needs or be able to provide them with the structured environment that their needs demand. Appellant admittedly has her own mental health issues that she continues to address. She only recently obtained independent housing. Before that, she lived briefly with her mother. During the approximately twenty years before Appellant moved in with her mother, Appellant lived in a home with her former husband. Even when Appellant had the support of her husband, Appellant did not adequately supervise or care for the children.

{¶86} Consequently, the trial court's finding that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting Appellee permanent custody is not against the manifest weight of the evidence.

### v. R.C. 2151.414(E)(7) to (11)

{¶87} The trial court found that the mother and the fathers abandoned their children and, thus, that R.C. 2151.414(E)(10) applies.

### vi. Balancing

{¶88} Here, we are unable to conclude that the trial court's best-interest determination is against the manifest weight of the evidence. A balancing of the factors supports the trial court's decision that placing the

children in Appellee's permanent custody is in their best interests.  The

children desperately need permanency and stability in order to address their

behavioral and emotional issues.  Appellant unfortunately showed that when

the children were in her custody, she did not prioritize their needs.  While

she claims to have learned the errors of her ways, the trial court had no

obligation to experiment with the children's welfare.

> "* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability.  To anticipate the future, however, is at most, a difficult basis for a judicial determination.  The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm." *In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, 2014 WL 7477958, ¶ 48, quoting *In re Bishop*, 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist. 1987).

{¶89}  Accordingly, based upon the foregoing reasons, we overrule

Appellant's third assignment of error and affirm the trial court's judgment.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and that costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hoover, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court,


BY:  _____
Matthew W. McFarland, Judge



## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**