[Cite as *In re D.B.*, 2021-Ohio-4170.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE D.B.    :

    :    Nos. 110506 and 110553

A Minor Child    :

    :

[Appeal by Mother and Father]    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 24, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-19-915401

---

### *Appearances:*

Rick L. Ferrara, *for appellant* Mother.

Judith M. Kowalski, *for appellant* Father.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* Cuyahoga County Division of Children and Family Services.

---

MICHELLE J. SHEEHAN, J.:

{¶ 1} Appellants mother and father appeal from a judgment of the juvenile court granting permanent custody of their child D.B. to the Cuyahoga County Division of Children and Family Services (hereafter "CCDCFS" or "agency"). Our

review reflects that the juvenile court properly engaged in the two-prong analysis set forth in R.C. 2151.414 and that clear and convincing evidence supports the court's decision granting permanent custody of D.B. Accordingly, we affirm the juvenile court's decision.

**Substantive History and Procedural Background**

{¶ 2} On November 6, 2019, the police responded to a domestic violence incident in the parents' residence. On December 17, 2019, the police responded to another domestic violence incident there. On December 23, 2019, D.B. (born in January 2014) was removed from the home.

{¶ 3} On December 24, 2019, CCDCFS filed a complaint alleging D.B. was abused and neglected, and requesting temporary custody. The complaint alleged that mother had anger management, substance abuse, and mental health issues; both parents abused marijuana and cocaine; and D.B. was at risk of being unenrolled from school due to a significant number of unexcused absences for the 2019-2020 school year. On the same day the complaint was filed, the trial court ordered D.B. to be placed in the predispositional temporary custody of CCDCFS.

**A. Temporary Custody Hearing**

{¶ 4} On August 6, 2020, a magistrate held a hearing on the agency's complaint for temporary custody of D.B. Officer Nate Wolf of the Cleveland Heights police department testified that the police had responded to domestic incidents on several occasions prior to November 6, 2019. On that day, the police arrived to find mother with a mark and bruises on her face. Mother told the officer that while she

was lying down with D.B., father wanted to cuddle with him and, when the child refused to lie down with father, father attacked mother, striking her with a closed fist, and a struggle ensued. Father told the officer, however, that he and mother had been arguing over other women, mother attacked him with a knife, and they struggled over the knife. In both accounts, D.B. was present when the two struggled. Father was arrested that night for domestic violence and booked into jail.

{¶ 5} Officer Wolf also observed the parents' apartment to be "inhabitable"; it was "filthy," and there was no real bed in the residence. D.B. appeared to have bug bites and sores all over him. Officer Wolf reported the parents to a child abuse or neglect hotline.

{¶ 6} Officer Andrew Trhlin, also of the Cleveland Heights police department, testified that on December 17, 2019, he responded to the parents' residence for a domestic violence incident. Father told the officer that mother came home after being out "drinking and drugging," and they argued about it. When he was walking away, mother pushed him from behind and he fell into a glass table. The clash caused a seven-inch abrasion on father's side. D.B. was in the apartment when the incident occurred. Father pressed charges against mother for endangering children, assault, and domestic violence. Mother was arrested.

{¶ 7} Brooke Gaines, a service worker from the agency, testified that the agency received a first referral for the family due to domestic violence and conditions of the home in November 2019, and a second referral regarding domestic violence in December 2019. The agency's investigation of the family identified concerns

relating to mother's mental health, both parents' domestic violence and substance abuse issues, and D.B.'s truancy from school.

{¶ 8} Gaines testified that during the agency's investigation, mother admitted to smoking marijuana, and father admitted to smoking crack cocaine with mother "for their bonding purposes." The parents were invited to attend the agency's meetings regarding D.B., but neither attended. Gaines referred the parents to alcohol and drug testing and assessment, but neither participated. Father was also referred to a domestic violence program, but he did not follow through. Regarding D.B.'s school attendance, mother explained that she had difficulties transporting him between home and school and sometimes she and D.B. would go to other family members' homes due to domestic violence.

{¶ 9} Social worker Arlethia Levison of CCDCFS testified that a case plan with the goal of unification was developed for the family. Mother's behavior was a concern because she would call the social worker, yelling and screaming. However, mother was now engaged in mental health services and receiving new medications. She also completed a domestic violence class and parental education class. Father did not participate in the services he was referred to. Mother had housing but father did not.

{¶ 10} Levison testified that D.B. was doing well in the foster home, but received medication to treat his behaviors; there was an incident where he was in the pool with the foster parents' biological daughter and he held her head down in the water.

{¶ 11} A case plan was developed for mother to work toward unification, and it included unsupervised visits and overnight stays. At the time of the permanent custody hearing, the visitation was being held via Zoom due to the Covid-19 pandemic, but supervised visits at mother's home were planned. Mother understood she needed to work on substance abuse and mental health issues to achieve unification.

{¶ 12} After the hearing, the magistrate found D.B. abused and neglected, and determined that it was in D.B.'s best interest to be committed to the temporary custody of the agency.

## B. Permanent Custody Hearing

{¶ 13} On October 2, 2020, the agency moved for permanent custody. On April 27, 2021, the trial court held a hearing on the agency's motion for permanent custody. Social worker Arlethia Levison, who was assigned this case since January 2020, provided testimony for the agency. Levison testified the agency sought permanent custody due to the trauma D.B. had experienced and also due to the lack of improvement and consistency on the parents' part addressing the issues that had caused D.B.'s removal. She did not believe the parents would successfully remedy the conditions leading to the child's removal if given more time, because they remained inconsistent with engaging in the services provided by the agency. The parents presented no witnesses.

### a. Mother's Case Plan

{¶ 14} Levison testified that the components of mother's case plan were mental health, substance abuse, parenting, and domestic violence. Regarding mental health, mother has issues of depression and PTSD. Mother was referred in 2020 to Frontline to address those issues. She was not consistently taking the prescribed medications, however. Between March and May 2020, mother failed to participate in the mental health service. Because mother appeared to have problems with transportation, the service provider offered bus tickets and referred her to a program for assistance with transportation, but it did not remedy the situation. Based on her interaction with mother, Levison had concerns regarding mother's emotional stability; mother would appear to understand certain matters but would have outbursts over the same matters later. Levison did not think mother had successfully addressed the mental health component of her case plan.

{¶ 15} Regarding the substance abuse component of the case plan, mother was originally referred to Recovery Resources but she did not complete the service there. Levison then referred her to Moore Counseling in March 2020. Mother completed an assessment through Moore Counseling but did not complete the recommended Intensive Outpatient Program ("IOP") following the assessment. Mother was then referred to the substance abuse service at Murtis Taylor in May 2020. Mother did not complete an assessment there. Mother was then referred to NORA, and she completed an assessment through that program in October 2020. She participated in the recommended IOP through NORA but was discharged from

it before completion.  Mother reported she was currently attending a program at Stella Maris.

{¶ 16} Regarding drug testing, mother failed to submit to random urine screens to demonstrate sobriety as requested.  Mother submitted to the agency screening only once — in February 2021 — and she tested negative, but she subsequently tested positive for cocaine in March 2021 through NORA.  The agency asked mother to submit to a drug test following the positive test but mother did not comply.  Levison was concerned that mother was still abusing substances.

{¶ 17} Because D.B. was frequently absent from school, left alone in the home at times, and in an environment where domestic violence occurred, mother's case plan required her to take a parenting class and demonstrate that she had benefited from the class.  Mother completed the class, but while she demonstrated certain parental skills she had learned from the class, there were occasions when she yelled at D.B. and hung up on him during virtual or telephone visitations.  Mother would temporarily improve her interactions with D.B. after discussions with Levison but would repeat the same improper behaviors later.  Levison did believe mother successfully addressed the parental aspect of her case plan.

{¶ 18} Regarding domestic violence, mother was referred to West Side Community House for a domestic violence counseling program, and she completed the program.  The agency remained concerned, however, because mother and father maintained a volatile, off-and-on relationship.

{¶ 19} Regarding housing, mother did not have stable housing; mother had provided four or five addresses since January 2020, and Levison had not been able to verify her housing situation due to difficulties communicating with mother.

### b. Father's Case Plan

{¶ 20} The components of father's case plan were parenting, domestic violence, substance abuse, and housing. Regarding parenting, father was referred to a parenting program in March 2020 and again in June, but he participated in neither. He eventually completed a parenting class. Despite the completion of the class, father continued to interact aggressively with D.B. during the virtual visits arranged during the pandemic. On one occasion, he stated to D.B., "I am going to put you in a headlock. I am going to choke you." Levison testified that the aggressive manner father interacted with D.B. had an effect on D.B. After visitations with father, he would show similar aggressive behaviors toward the foster family's biological and foster children. Father acknowledged his inappropriate behaviors, but continued to act in the same manner. Levison did not believe father successfully addressed the parenting component of his case plan.

{¶ 21} Regarding domestic violence, father was referred to Moore Counseling and Murtis Taylor in March and May 2020, respectively, but he did not complete either. He was then referred to a virtual program at the West Side Community House and East End Neighborhood House in June and September 2020, respectively. He did not complete any of these referred services, but provided a certificate for a Beech Brook domestic violence class that he completed in early 2021.

Despite the completion of that class, father did not appear to have successfully addressed the domestic violence of his case plan. While he was advised against being on virtual visits together with mother, they would still appear together on occasions, and on one such occasion, they yelled and screamed at each other, despite the presence and supervision of a visitation coach.

{¶ 22} Regarding substance abuse, father has a history of abusing cocaine and marijuana. Father was first referred to Recovery Resource following the child's removal from the home, but he did not participate. He was then referred to Moore Counseling in March 2020, Murtis Taylor in June 2020, and East End Neighborhood in September 2020. He did not participate in any of these referred services. Furthermore, father has never completed a substance abuse assessment required by the agency. Despite being asked to submit to random drug testing to verify his sobriety, he completed only one urine screen — in February 2021 — and he tested positive for cocaine on that occasion. He did not comply with the agency's requests for additional tests.

{¶ 23} Regarding housing, the agency provided father with referrals to assist him with obtaining housing and also gave him a list of housing in December 2020. During 2020, father reported he was living in a shelter and at one point residing with his father. Before trial, he reported he was residing with mother, but Levison was unable to inspect that residence because she was not permitted inside.

### c. Visitations

{¶ 24} Regarding the visitation schedule, the parents were to meet with D.B. every Wednesday. The visitations were two-hour sessions with one hour for each parent. Because of the restrictions caused by the Covid-19 pandemic, the visiting schedule rotated between in person and virtual formats. There was a supportive visitation coach present in the room when the visits were held in person, but the coach would not be in the same room when the visits were virtual. Levison acknowledged that the outcome would have been better if the visits were all in person with the supportive visitation coach in the same room.

{¶ 25} Between October and December 2020 and between January and February 2021, the parents cancelled the visits on several occasions, but the visits were consistent in March and April 2021. According to Levison, on several occasions mother falsely claimed she was unable to visit because she was attending the IOP.

### d. Child

{¶ 26} D.B. was placed in a licensed foster home after he was removed from the home. The foster parents have four biological children and four other foster children. The biological children treat him like their own little brother, and he treats them like siblings; the foster parents treat D.B. like he is one of their own children. D.B. has an IEP to address his special needs, and he is being treated by a psychiatrist in individual counselling sessions.

### e. GAL's Recommendation

{¶ 27} Thomas Kozel, the guardian ad litem ("GAL") for D.B., recommended permanent custody. D.B. had reported to him that he liked his foster placement and wished to stay there. In the GAL's opinion, the parents' substance abuse was the primary concern in this case because it impacted all other issues regarding their ability to parent D.B. D.B. had been in the agency's custody for 16 months at the time of the hearing, and the parents had yet to show a commitment to maintain sobriety; they had not completed the substance abuse services and had not shown any consistency in submitting to drug testing.

### f. Trial Court Judgment Granting Permanent Custody

{¶ 28} The trial court granted the agency's motion for permanent custody of D.B., finding the existence of R.C. 2151.414(B)(1)(a): the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. In support of that determination regarding each parent, the trial court found the presence of the factors set forth in R.C. 2151.414(E)((1) (failing continuously and repeatedly to substantially remedy the conditions causing the child's removal), (E)(2) (having chemical dependency so severe such that the parent was unable to provide an adequate, permanent home), (E)(4) (demonstrating a lack of commitment toward the child), and (E)(14) (unwilling to provide shelter or to prevent the child from suffering emotional or mental neglect).

**{¶ 29}** Regarding the best interest of the child, the trial court found that a grant of permanent custody is in the best interest of the child upon its consideration of the factors enumerated in R.C. 2151.414(D)(1).

**Appeal**

**{¶ 30}** Both mother and father appeal from the trial court's judgment. This court sua sponte consolidated the two appeals for oral argument and disposition. Mother raises the following assignment of error:

I.   The trial court abused its discretion in awarding permanent custody because the state did not present sufficient, clear and convincing evidence necessary for the order.

Father raises the following two assignments of error:

I.   The Cuyahoga County juvenile court erred and abused its discretion in finding that clear and convincing evidence supported granting permanent custody of the subject child to the Cuyahoga County [Division] of Children and Family Services.

II.  The parents' ability to complete and benefit from case plan services was hampered by the restrictions imposed by the Covid-19 pandemic.

Mother's sole assignment of error raises the same claim as father's first assignment of error, and father's second assignment of error is related to his first assignment of error. For ease of discussion, we address these assignments jointly.

**A. Standard of Review**

**{¶ 31}** We begin our analysis with the recognition that, while a parent's right to raise a child is an essential and basic civil right, *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), children have the right to "parenting from either natural or

adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).

{¶ 32} Under Ohio's permanent custody statute, R.C. 2151.414, the juvenile court's judgment granting permanent custody must be supported by clear and convincing evidence. Clear and convincing evidence has been defined as "'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. We will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by clear and convincing evidence. *See, e.g., In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 48; *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

## B. Two-Prong Analysis for Permanent Custody

{¶ 33} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B). Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the five factors under R.C. 2151.414(B)(1)(a) to (e) exists and,

furthermore, permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 34} Under the first prong of the permanent-custody analysis, the juvenile court is to determine if any of the following factors exists: whether the child is abandoned (R.C. 2151.414(B)(1)(b)); whether the child is orphaned and there are no relatives of the child who are able to take permanent custody (R.C. 2151.414(B)(1)(c)); whether the child has been in the temporary custody of public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)); whether another child of the parent has been adjudicated as abused, neglected, or dependent on three separate occasions (R.C. 2151.414(B)(1)(e)); or, when none of these factors apply, whether "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." (R.C. 2151.414(B)(1)(a)).

{¶ 35} If any of these five factors under R.C. 2151.414(B)(1) exists, the trial court proceeds to analyze the second prong — whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency. R.C. 2151.414(D)(1).

### a. First Prong: R.C. 2151.414(B)(1)

{¶ 36} Here, under the first prong of the permanent-custody analysis, the trial court found the presence of the R.C. 2151.414(B)(1)(a) factor — that D.B. cannot

be placed with either mother or father within a reasonable time or should not be placed with either mother or father.

{¶ 37} For this finding, R.C. 2151.414(E) enumerates 15 factors for the court to consider.  In this case, the trial court found the presence of the (E)(1), (E)(2), E(4), and (E)(14) factors regarding both parents.   Pertinent to this appeal, R.C. 2151.414(E) states, in relevant part:

> (E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing * * *[.]
>
> * * *
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the

child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶ 38} The trial court's finding regarding the existence of these factors is supported by clear and convincing evidence presented by the agency at the hearing. In its efforts to facilitate unification, the agency prescribed a case plan to address mother's issues of mental health, substance abuse, parenting, and domestic violence, and father's issues of housing, parenting, domestic violence, and substance abuse.

{¶ 39} Mother completed a parenting class and did demonstrate some of the parental skills she learned. The social worker testified, however, mother failed to consistently demonstrate that she benefited from the services; she yelled at D.B. and hung up on him on some virtual or telephone visitations. Mother was not compliant regarding her medications, and the social worker remained concerned with mother's emotional stability based on her interactions with mother.

{¶ 40} While father completed a parenting class, he continued to interact with D.B. in an aggressive manner, which affected D.B.'s own behaviors with others.

{¶ 41} The parents were both arrested for domestic violence incidents that occurred in the presence of D.B. While both parents completed a domestic violence program, they did not seem to sufficiently benefit from the program; the parents

continued to maintain a volatile relationship, and on one visitation with the child, they screamed at each other despite the presence of the visitation coach.

{¶ 42} While mother was engaged in a substance abuse program at the time of the permanent custody hearing, she had not been consistent in utilizing the services provided to her, nor did she consistently demonstrate sobriety as required. Father failed to participate in any substance abuse program referred to him by the agency and similarly failed to demonstrate sobriety. In recommending permanent custody, the GAL was most concerned with the parents' substance abuse as it impacted all the components necessary for the parents' ability to provide and care for D.B. Indeed, the parents' lack of commitment is most evident in their unwillingness to address their substance abuse and work toward sobriety; both father and mother tested positive for drugs within months of the permanent custody hearing.

{¶ 43} Father argues that his efforts to comply with the case plan were hampered by the Covid-19 pandemic. He argues specifically that the virtual visitation lacks the quality of face-to-face interactions, and his ability to find housing was hindered by the pandemic. Undoubtedly, the pandemic presented a great challenge to the parents and may have affected their ability to complete their case plan. However, our review of the transcript reflects that the trial court was cognizant of the impact of the pandemic and took it into consideration when granting permanent custody. Notably, neither parent presented evidence to show that the pandemic impeded their efforts to complete the substance abuse component of their

case plan. As the GAL opined, the parents' continued drug use and failure in addressing their substance use underlies all the issues regarding their inability to adequately provide and care for D.B. That failure, which well demonstrated the parents' lack of commitment, was not attributable to the pandemic.

{¶ 44} Pursuant to R.C. 2151.414(E), if the court determines, by clear and convincing evidence, that one or more of the (E)(1)-(15) factors exist, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *See, e.g.*, *In re I.R.*, 8th Dist. Cuyahoga No. 110410, 2021-Ohio-3103, ¶ 69 (based on its findings under R.C. 2151.414(E), the juvenile court was required to find that the child could not be placed with either of his parents within a reasonable time or should not be placed with either parent), citing *In re C.H.*, 8th Dist. Cuyahoga Nos. 82258 and 82852, 2003-Ohio-6854, ¶ 58. Because our review reflects clear and convincing evidence relating to the (E)(1), (E)(2), (E)(4), and (E)(14) factors, the trial court properly found D.B. cannot be placed with either parent within a reasonable time or should not be placed with either parent.

### b. Second Prong: Best Interest of the Child

{¶ 45} Once the juvenile court determines that one of the five factors listed in R.C. 2151.414(B)(1) is present, the court proceeds to an analysis of the child's best interest. The court undertakes this analysis with the recognition that although parents have a constitutionally protected interest in raising their children, that interest is not absolute and is always subject to the ultimate welfare of the child. *In*

*re B.L.*, 10th Dist. Franklin No. 04AP-1108, 2005-Ohio-1151, ¶ 7; and *In re N.M.*, 8th Dist. Cuyahoga No. 106131, 2018-Ohio-1100.

{¶ 46} In determining the best interest of the child, R.C. 2151.414(D) mandates that the juvenile court consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 47} When analyzing the best interest of the child, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

{¶ 48} Here, the trial court stated it found permanent custody to be in the child's best interest after its consideration of (1) the child's interaction and relationship with his parents, siblings, relatives, and foster parents, (2) the wishes of the child, (3) the child's custodial history, (4) the child's need for a legally secure

permanent placement, and (5) the report of the GAL, who recommend permanent custody to the agency.

{¶ 49} Our review reflects the trial court's decision is supported by clear and convincing evidence contained in the record. The child was removed from the home in December 2019 due to domestic violence incidents that occurred in his presence and his truancy issues. He had been in the agency's custody for 16 months at the time of the permanent custody hearing. Mother and father asked for additional time to work on their case plans, yet failed to demonstrate that they would achieve the goals set forth in the case plan if they were given more time. D.B. has been with his current foster family since his removal from the home in December 2019. The social worker reported he is doing well in the foster family; he treats them as family, and they treat him as one of their own. The social worker's testimony also reflects mother and father had difficulties interacting with D.B.: father was aggressive toward D.B. during some visitations and mother would terminate the visitations abruptly when she became upset with D.B. The GAL reported that the child liked his placement and wished to stay in the foster family.

{¶ 50} In affirming the trial court's judgment granting permanent custody, we are mindful that "[i]n proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation cannot be conveyed to a reviewing court by printed record." *In re V.M.*, 4th Dist. Athens No. 18CA15, 2018-Ohio-4974, ¶ 62,

citing *Trickey v. Trickey*, 158 Ohio St. 9, 106 N.E.2d 772 (1952). "'The discretion that the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re Ch. O.*, 8th Dist. Cuyahoga No. 84943, 2005-Ohio-1013, ¶ 29, quoting *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994).

{¶ 51} For all the foregoing reasons, we find no merit to mother's first assignment of error and father's first and second assignments of error. The trial court's judgment granting permanent custody to CCDCFS is affirmed.

{¶ 52} Judgment affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
MARY EILEEN KILBANE, J., CONCUR